IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 36305-8-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| COUGAR RAY HENDERSON, | ) | |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Cougar Ray Henderson appeals his conviction of second degree rape, challenging the sufficiency of the evidence and evidentiary and instructional rulings by the trial court. Finding only one erroneous ruling by the trial court, and that it was harmless, we affirm.

FACTS AND PROCEDURAL BACKGROUND

In April 2017, then 20-year-old E.J. reported to police that over three years earlier, while a senior in high school, she had been raped by Cougar Henderson. The State charged Mr. Henderson with the second degree rape of E.J. in January 2018. Following an amendment of the charges and an order severing other charges against Mr. Henderson for separate trials, the prosecution for the alleged rape of E.J. proceeded to jury trial in May 2018.

E.J. testified that she had known Mr. Henderson, who was about 16 months older than her, through school and drama productions. He had already graduated high school. On the night of the alleged rape, E.J. and Mr. Henderson had arranged to meet at a local park. E.J. testified that a few nights earlier, she and Mr. Henderson had "met up . . . and had made out a little bit, fooled around, nothing too serious," and she was "expecting something similar." Report of Proceedings (RP) at 127-28. She described what happened on that earlier occasion as "[k]issing, touching, but nothing under the clothes," and "[a]ll voluntary and consensual." RP at 168.

When they arrived at the park, E.J. got into Mr. Henderson's car, a 1999 Toyota Camry, and they drove to an area with which E.J. was not familiar and parked on the shoulder of a country road. They talked and leaned toward each other over the console separating the front seats of the Camry as E.J. looked at something on Mr. Henderson's cell phone; that led to kissing. E.J. testified she was startled when Mr. Henderson reached over her, depressed the lever on her seat, pushed it to a fully reclined position and then was on top of her. She testified that she had never been with anyone who took such an aggressive approach and she was further startled by the way Mr. Henderson would grip her, kiss her, and bite her, leaving her with multiple hickeys and bruises on her neck and chest. RP at 130. She did not object at that point, and they continued to kiss and touch each other. E.J. acknowledged that as the sexual encounter continued, either she, or the two of them, removed her shorts and sweatshirt. She testified that she

2

or they might have removed her underwear as well. She testified that Mr. Henderson

manually stimulated her, including by inserting his fingers in her vagina, which she

acknowledged was consensual.

E.J. testified that on the night of the alleged rape she had never before had penile-

vaginal sex and she had no intention of having it that night. There came a point when she

saw that Mr. Henderson had unzipped his pants and withdrawn his penis, however,

causing her to verbally protest and try, unsuccessfully, to move away. Undeterred by her

objections, Mr. Henderson partially inserted his penis into her vagina multiple times until

she pushed him off of her with "[a] good shove." RP at 169. Because her testimony is

critical to Mr. Henderson's sufficiency challenge, we reproduce it at some length.

During her direct examination she testified that she was "okay with" Mr.

Henderson fingering her and manually stimulating her, but "[l]ater, he withdrew his penis

and attempted to penetrate me." RP at 130. Asked about this further in her direct

examination, she testified:

> [PROSECUTOR:] . . .[A]fter he had digitally fingered you, and you
> mentioned that he withdrew his penis, did you consent to further conduct?
>
> A. No. In fact I opposed. I said, "No. Please, I don't want to do this right
> now. Please, stop." Eventually he started pressing the head of his penis
> up again[st] my vulva and my inner thighs and trying to penetrate me.
> The whole time he was getting verbal warnings, and—
>
> Q. Did you do anything physically?
>
> A. Eventually I had to after he ended up penetrating me multiple times
> with the head of his penis I had to put my elbow up in front of me and
> then push him back into the passenger seat—or the driver's side seat.

3

Q. Did you at any point try to pull away from him?

A. Yeah, we were reclined in a car. There wasn't a lot of space I could go but when he is coming at me I remember trying to scoot back in the seat.

Q. Did he have a condom with him?

A. No.

Q. Did he offer a condom at any point?

A. No.

. . . .

Q. So after you put up your elbow what did he do?

A. I had to use physical force to push him into the front seat of the car, the driver's side seat. And eventually he withdrew and flopped over into the driver's side seat and proceeded to masturbate for 15, 20 seconds.

Q. Did he ever ejaculate?

A. No.

Q. Did you try to get away? Did you try to leave the car?

A. No. He had his, I guess his left arm over me, and he was blocking the door. He was physically on top of me.

Q. Did you consider leaving the car?

A. I don't think I really did. I didn't know where we were and it was nighttime. I don't think I would have felt comfortable with that.

Q. Do you recall how many times he inserted his penis?

A. A few; three to six times.

Q. How far did he insert his penis?

A. Only the first few inches, never fully.

Q. What happened after he stopped masturbating?

A. I asked to be taken back to my car, and he drove me back in silence.

RP at 130-32.

4

E.J. testified during her direct examination that she became concerned several weeks later that she might be pregnant. She confided in her mother and ended up going to a women's clinic to take a pregnancy test, which was negative. When the prosecutor showed E.J. a document marked for identification as exhibit P1 and obtained her agreement that it was a fair and accurate representation of a report of the pregnancy test results that she received and had provided to police, the defense objected. Outside the presence of the jury, defense counsel argued that the document was hearsay, and no business record exception had been established. The objections were overruled and the document was admitted.

The State questioned E.J. about whether she told others about the alleged rape at the time, and she said she had, but

> [Mr. Henderson] would talk to them and deny ever doing anything with me and deny having sex with me and deny the events of that evening and really do anything to break my bonds with my friends. Called me a liar and kind of turned all my friends against me.

RP at 140. She said she became "really depressed," gained weight, and was mentally and physically "not well." *Id.*

Defense counsel's cross-examination of E.J. about Mr. Henderson's actions elicited the following testimony:

> Q. And at what point did, based on your story here, Cougar's penis become exposed?
> A. He reached for his belt, and opened his belt, unbuttoned his pants and unzipped his pants, and I think, I don't remember what kind of

5

> underwear he was wearing, if it was a loose fabric that he could just pull it through or if he pushed it down over. But his penis, he exposed himself completely. I did not reach down and touch him.
>
> Q. Did you help him unbutton his pants?
>
> A. No.
>
> Q. Or remove his belt?
>
> A. No.

RP at 158. Questioned about whether Mr. Henderson was lying on top of her, E.J. testified that he was not; she assumed he was supporting himself with at least one knee on the car seat, adding, "I'm assuming there was one leg up. I remember him being over me when he unbuttoned himself. Enough space between us for him to maneuver and for me to see what's happening." RP at 159. The cross-examination continued:

> Q. And then he inserted his penis in your vagina?
>
> A. Yes. He started by advancing towards me with it. He had one hand on his penis and was pressing and rubbing it up against my vulva and my inner thighs. At that point I began to protest.
>
> Q. Okay.
>
> A. And then after that he began to insert it multiple times all the while, while I am protesting.
>
> Q. By protesting you are saying that he was inserting his penis and you were saying don't do that?
>
> A. Saying, "No. Stop. I don't want to do this."
>
> Q. Okay. And were you concerned about that because he had no condom?
>
> A. That, and I wasn't comfortable with having sex that night. I had no intention of having sex. I was fine with foreplay, and touching, and kissing. I had no intention of having sex that night. And there was no ask for a consent or talk about protection at all.
>
> Q. And had you expressed these views to him before that night?

6

A.  Not prior.  But with enough time before he touched me with his penis.

RP at 160.

During cross-examination, defense counsel asked E.J. whether she had been diagnosed with Graves' disease "sometime after that or about that time."  RP at 161.  The State's objection that the question was beyond the scope of direct examination was sustained.  The State did not object when defense counsel asked if E.J. was presently on medication, to which she answered, "Yeah," but it did object when defense counsel asked what she was taking.  *Id.*

The trial court excused the jury, and defense counsel told the court he wished to inquire about Graves' disease in part because he believed that physical and emotional complaints that E.J. and her mother attributed to the alleged rape were "totally consistent" with the disease's symptoms.  RP at 163.  Defense counsel also argued that the question about medication was "sort of a stock question" given that medication might affect her ability to testify or recall.  *Id*.  The trial court asked E.J. about medications she was presently taking and she answered that she was taking a thyroid supplement, Levothyroxine.  Asked by the court if she found it to have any side effects, she answered, "No."  RP at 165.

Defense counsel was permitted to conduct further voir dire and elicited E.J.'s testimony that she had Graves' disease, that it was diagnosed in April 2014, and that it was diagnosed after she had suffered for a time with "anxiety and depression and voices

7

in [her] head and cognitive difficulties." RP at 165. Defense counsel argued that E.J.'s

Graves' disease went to "the credibility of this witness to recall" and to whether

difficulties E.J. attributed to the alleged rape were "explained by her disease." RP at 166.

Because defense counsel stated it would offer no medical testimony, the court sustained

the State's objection.

When cross-examination resumed, defense counsel elicited the following

additional testimony about the alleged act of rape and events immediately preceding it:

> Q. . . . You said at a certain point after Cougar had inserted his penis in
>    your vagina you raised an elbow?
>
> A. Um hmm.
>
> Q. Or your forearm?
>
> A. Yes.
>
> Q. And did he then stop penetrating you?
>
> A. Eventually. I had to use force to lift him off of me and give him a real
>    physical notice and eventually, yes, he stopped.
>
> Q. And how long did that take?
>
> A. A few seconds.
>
> Q. A few seconds, okay.
>
> A. A good shove.
>
> Q. So you just kind of pushed him off after he had penetrated you?
>
> A. Multiple times, yes.
>
> Q. Okay. Now, I want to go back just maybe a few seconds or minutes to
>    the period of time before he placed his penis inside you.
>
> A. Okay.
>
> . . . .

Q. . . . Before, before Cougar Henderson placed his penis in your vagina the first time, did he use any physical force against you to cause you to submit to sexual intercourse?

A. Okay. He was over me. There was a looming physical presence over me. I had nowhere to go. And before he inserted it in me he was pressing it up against me and pressuring me. Physically I attempted to scoot back away from that and he persisted. So, yes, before the first insertion he was physically pressuring me.

. . . .

Q. Apart from his being on top of you did he use any physical force to cause you to submit to sexual intercourse?

A. Like holding me down?

Q. Yeah, or hitting you?

A. No, he never hit me.

Q. Did he use any other physical force or any weapon of any kind?

A. Weapons, no. I would say that the physical presence of him leaning over me, one arm between me and the door, and the car seat behind me, and his hand on his penis shoving it into me, I would call that a physical force.

RP at 168-70. E.J. admitted that at the time of the alleged rape, Mr. Henderson never threatened her or threatened to harm anyone else.

Mr. Henderson testified in his own defense. According to him, he and E.J. had only one sexual encounter, and it was on the night of September 24, 2013, not September 21, 2013, as E.J. had testified. He testified that neither removed any clothing and that, while he might have reclined the passenger seat in which she was sitting and leaned across the console so they could kiss and grope one another, his lower body never left the

9

driver's seat of the car. He testified that he never penetrated E.J.'s vagina with his fingers and that at no point in their encounter had she resisted him in any way.

The defense brought the actual passenger's seat from Mr. Henderson's Camry into the courtroom as a demonstrative aid, and he testified to measurements he had taken from within the car to support his opinion that it would have been impossible for him to climb into the passenger seat area with E.J. He testified that following the 20 or 30 minutes that they kissed and groped, they resumed talking and he expressed his view that their making out was probably a bad idea. According to him, that, and the fact that he turned down her request that he accompany her to a homecoming dance, made her unhappy with him.

In the State's rebuttal case, it called two witnesses to counter Mr. Henderson's testimony that the front passenger seat area of his Camry was too constricted to accommodate people engaged in sexual intercourse. The first, the investigating detective who had been present throughout the trial, testified that he had taken the opportunity during a recess to look at Mr. Henderson's Camry and found it to have "[c]onsiderably more [head space] than [Mr. Henderson] described." RP at 275. The second witness, a Walla Walla police officer, testified that he had formerly owned a 1989 Toyota Camry, that he was familiar with later model Camrys, which he believed were bigger, and that he had been able to have sexual intercourse comfortably with a woman in the car's front passenger seat.

10

The trial court's instructions to the jury included the Washington pattern instruction defining "forcible compulsion," which is virtually identical to the term's statutory definition at RCW 9A.44.010(6), and states:

> Forcible compulsion means physical force that overcomes resistance, or a threat, express or implied, that places a person in fear of death or physical injury to oneself or another person or in fear of being kidnapped or that another person will be kidnapped.

11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 45.03, at 918 (4th ed. 2016) (WPIC). In the final instruction conference, the trial court addressed Mr. Henderson's request for a further instruction that forcible compulsion "requires more than the force normally used to achieve sexual intercourse, or sexual contact," an instruction that he supported by citation to *State v. Ritola*, 63 Wn. App. 252, 254, 817 P.2d 1390 (1991). RP at 286-87; Clerk's Papers (CP) at 27. The trial court observed that comments to WPIC 45.03 cite case law applying that language from *Ritola*, but the comments go on to say:

> Under some circumstances the resistance by the victim required to show forcible compulsion need not be physical resistance. Instead it is a fact-sensitive determination based on the totality of the circumstances, including the victim's words and conduct.

RP at 287; WPIC 45.03 (citing *State v. McKnight*, 54 Wn. App. 521, 526, 774 P.2d 532 (1989)). The court declined to give the proposed instruction. Mr. Henderson made a record of his objection.

The jury found Mr. Henderson guilty.  The trial court imposed a high-end sentence of 114 months.  Mr. Henderson appeals.

ANALYSIS

Mr. Henderson assigns error to (1) entry of a judgment supported by insufficient evidence, (2) the trial court's ruling sustaining the State's objection to cross-examination about E.J.'s Graves' disease, (3) its admission of exhibit P1, the record of the results of E.J.'s pregnancy test, and (4) its refusal to give his proposed jury instruction elaborating on forcible compulsion.  We address the assignments of error in the order raised.

I.      THE STATE'S EVIDENCE OF FORCIBLE COMPULSION WAS SUFFICIENT

"A person is guilty of rape in the second degree when, under circumstances not constituting rape in the first degree, the person engages in sexual intercourse with another person . . . [b]y forcible compulsion."  RCW 9A.44.050(1)(a).  As defined by statute, "'[f]orcible compulsion' means physical force which overcomes resistance, or a threat, express or implied, that places a person in fear of death or physical injury to herself or himself or another person, or in fear that she or he or another person will be kidnapped."  RCW 9A.44.010(6).  The plain language of the definition does not require that physical force overcome *physical* resistance.  This court held 30 years ago that the victim's resistance need not be manifested by physical means.  *McKnight*, 54 Wn. App. at 525.  This court has also stated that force that "*prevent*[*s*] resistance" qualifies as force that

12

"*overcome*[*s*]" resistance. *Ritola*, 63 Wn. App. at 254-55 (emphasis added) (quoting

*McKnight*, 54 Wn. App. at 527).

In *Ritola*, this court addressed whether forcible compulsion was proved in an

indecent liberties case in which there had been no opportunity for resistance. The

appellant, a juvenile, had been standing behind and a little to the right of a female

counselor when he "suddenly grabbed her right breast, squeezed it, [and] then

'instantaneously' removed his hand." 63 Wn. App. at 253. The trial court found that the

act

> occurred so suddenly that the counselor did not have time to resist before
> it was completed. It further found, however, that resistance could be
> "implied," and that Ritola had therefore brought about sexual contact by
> forcible compulsion.

*Id.* (footnote omitted).

On appeal, this court observed that "force," in a scientific sense, "is involved in

every act of sexual touching, and if forcible compulsion and force were synonymous,

every such act would be criminal." *Id.* at 254. The opinion cited approvingly to an

earlier formulation that forcible compulsion "is not the force inherent in any act of sexual

touching, but rather is that 'used or threatened to overcome or prevent resistance.'" *Id.* at

254-55 (quoting *McKnight*, 54 Wn. App. at 527). It held "there is no evidence that the

force [Ritola] used overcame resistance, for he caught the counselor so much by surprise

that she had no time to resist." *Id.* at 255.

13

Mr. Henderson argues that the State did not prove forcible compulsion because the

only force proved was the force inherent in sexual touching. But the State's evidence in

this case was stronger than the evidence in *McKnight*, in which this court, 30 years ago,

found sufficient evidence of force. In that case, the teenaged victim verbally protested

but never physically resisted the intercourse, which took place on a couch in her home.

Addressing McKnight's argument that the evidence against him did not show the use of

more force than normally required to achieve penetration, the majority opinion stated:

> Reasonable minds can differ as to whether the acts of slowly pushing C to a prone position and then removing her clothes in response to the victim's requests that the advances stop manifest a degree of force greater than that which is inherent in the act of intercourse. A reasonable juror could, however, infer from the evidence that these were acts of force over and above what is necessary to achieve intercourse and that these acts were employed to overcome C's resistance. The evidence, when taken as a whole and viewed in a light most favorable to the prosecution, establishes that the act of intercourse was accomplished by the use of force.

54 Wn. App. at 528.

Mr. Henderson tries to distinguish *McKnight* on several bases that are irrelevant,

including that he and E.J. were better acquainted than the teenagers in *McKnight*, that he

and E.J. had a prior sexual encounter (at least according to E.J.), and that E.J. anticipated

and welcomed the early parts of their sexual encounter. A person can be raped by

someone she knows well. She can be raped by someone with whom different sexual

contact was consensual.

14

Mr. Henderson also argues that "[i]n *McKnight* the defendant pushed the victim down" and "[i]n this case, there was no pushing." Appellant's Opening Br. at 22. He fails to consider E.J.'s testimony that Mr. Henderson "reached over me and depressed the lever and pushed the passenger seat all the way back." RP at 129. Getting E.J. into a reclining position by pushing her seat back is functionally indistinguishable from McKnight "slowly pushing C to a prone position" on her couch. *McKnight*, 54 Wn. App. at 528.

Reasonable jurors could find that Mr. Henderson's conduct manifested a degree of force greater than that inherent in the act of intercourse. As Judge Morgan observed in *Ritola*, force in the scientific sense is "what puts an object or body into motion, the result sometimes but not always being contact with another object or body." 63 Wn. App. at 254. No particular type or degree of physical force on the part of the perpetrator is required by statute other than physical force that overcomes or prevents resistance.

Mr. Henderson was taller and larger than E.J., and he both lowered the seat in which she was sitting and crossed a center console to get on top of her. Although she testified he was not "lying" on top of her, one can infer from her testimony as a whole that she meant he was not resting the weight of his body on her. Her testimony was clear that the way he was positioned above her limited her ability to move. In cross-examination, E.J. was asked, "Apart from his being on top of you . . . [d]id he use any other physical force or any weapon of any kind?" to which she responded:

15

> Weapons, no. I would say that the physical presence of him leaning over me, one arm between me and the door, and the car seat behind me, and his hand on his penis shoving it into me, I would call that a physical force.

RP at 170. She "tr[ied] to scoot back in the seat," but "had nowhere to go." RP at 131, 169.

The jury clearly did not believe Mr. Henderson's version of events, but his testimony about the small size of the Camry's front passenger seat area and the obstruction created by the console, gear shift, and emergency brake supported E.J.'s description of circumstances in which she was essentially trapped.

Mr. Henderson argues that failing to require proof of a greater use of force allows the State to punish him for second degree rape when his conduct amounted to only third degree rape. Under former RCW 9A.44.060 (2013), third degree rape without consent was committed "when, under circumstances not constituting rape in the first or second degrees, such person engages in sexual intercourse with another person . . . [w]here the victim did not consent as defined in RCW 9A.44.010(7), to sexual intercourse with the perpetrator and such lack of consent was clearly expressed by the victim's words or conduct."[1] The injury to E.J. was more egregious than a third degree rape. Forces put in

---

[1] RCW 9A.44.060 was amended in 2019 to eliminate any requirement that the victim clearly express a lack of consent by words or conduct. LAWS OF 2019, ch. 87, § 3. It now provides that the crime is committed if the victim "did not consent as defined in RCW 9A.44.010(7), to sexual intercourse with the perpetrator." RCW 9A.44.060(1)(a). Under current law, it would have been third degree rape and a class C felony if Mr. Henderson's and E.J.'s encounter had taken place on a blanket on open ground and she

motion by Mr. Henderson, including his presence on top of her—from which he did not budge as she clearly and repeatedly told him to stop—prevented or overcame her ability to resist by pulling away.

The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt. *State v. Witherspoon*, 180 Wn.2d 875, 883, 329 P.3d 888 (2014). The evidence was sufficient.

II.     THE TRIAL COURT DID NOT ERR IN SUSTAINING THE STATE'S OBJECTION TO CROSS-
        EXAMINATION ABOUT GRAVES' DISEASE

Mr. Henderson's lawyer questioned prospective jurors about their knowledge of Graves' disease during voir dire. Only two prospective jurors indicated any familiarity with it:

> [DEFENSE COUNSEL]: . . . Does anyone have any familiarity with Graves Disease? Anybody know what Graves—it's a form of hyperthyroid—[Juror No. 40], do you know what this thyroid disease is?
>
> JUROR NO. 40: Graves Disease is a thyroid disease determined by a test called TSH.
>
> [DEFENSE COUNSEL]: And do you know that the symptoms include; psychiatric matters like anxiety, depression—
>
> JUROR NO. 40: I really don't know. No, I don't, okay? But at this point I'll believe you.
>
> [DEFENSE COUNSEL]: I'm not—I want you to believe me, but this isn't a test. I'm just trying to find out what you know, that's all.

---

had never verbally protested at all.

Anyone else have any familiarity with hyperthyroidism, or a form known as Graves Disease?

[Juror No. 4], I thought you would.[2]

JUROR NO. 4:  Same information; overactive thyroid, diagnosed by blood test, TSH, that can cause an imbalance in the endocrine system.  Yes, you can have some anxiety, depression.

[DEFENSE COUNSEL]:  Cognitive problems?

JUROR NO. 4:  Limited, yes.

RP at 104-05.  None of the jurors ultimately seated indicated any familiarity with the disease.[3]

When E.J. later testified, the State objected when defense counsel began questioning her about her Graves' disease, stating that the questions went beyond the scope of its direct examination.  Outside the presence of the jury, defense counsel said he was interested in medication that could affect E.J.'s ability to testify or recall and "[t]he Graves Disease matter is also relevant because the very symptoms her mother describes her suffering from at the time of the incident in question are totally consistent with text[book] Graves Disease symptoms."  RP at 163.  Asked by the trial court, "Are you going to have medical testimony?," defense counsel answered "No.  I don't think I need it."  *Id.*

---

[2] The lawyers would have had more information about the prospective jurors than appears in our record, but it was revealed during voir dire that juror 4 worked in health care and had been employed at hospice.

[3] Juror 4 was excused by Mr. Henderson's exercise of a peremptory challenge.

18

Under ER 611(b), "[c]ross examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness." The rule is subject to state and federal constitutional protections of the right to confrontation, including the right to conduct a meaningful cross-examination of adverse witnesses. *State v. Darden*, 145 Wn.2d 612, 620, 41 P.3d 1189 (2002). The purpose of cross-examination is to test the witness's perception, memory, and credibility. *Id.* The right to cross-examination is not absolute, however, and a trial court may deny cross-examination if the evidence sought is vague, argumentative, speculative, or irrelevant. *Id.* at 620-21. We review a trial court's limitation of the scope of cross-examination for an abuse of discretion. *State v. Lee*, 188 Wn.2d 473, 486, 396 P.3d 316 (2017).

Given the opportunity to voir dire E.J., defense counsel established that her physical and emotional complaints following the alleged rape also preceded her April 2014 diagnosis with Graves' disease. He argued to the trial court that her physical and emotional problems following the alleged rape were "explained by her disease." RP at 166. But voir dire had not established that E.J. had the medical understanding to trace particular physical or emotional complaints to their source. Nor did the defense intend to call a medical expert who could. The trial court ruled that "[i]f there was any testimony contemplated that would bridge [the] huge gap" between E.J.'s complaints and the defense argument attributing them to Graves' disease, "I would allow it." RP at 166.

Absent competent medical testimony, the evidence sought by the defense was speculative. The court did not abuse its discretion in sustaining the State's objection.

III.     THE TRIAL COURT ERRED IN ADMITTING EXHIBIT P1, BUT THE ERROR WAS
         HARMLESS

Mr. Henderson argues that exhibit P1, the report of the results of E.J.'s October 2013 pregnancy test, was unauthenticated, hearsay, and prejudicial. E.J. testified without objection that she became worried about being pregnant and had a blood test performed at a women's clinic. She testified without objection that she had received a report of the test results and gave it to police. She was then asked if exhibit P1 was a fair, accurate and unmodified representation of the report. When she testified that it now bore a stamp but otherwise was, the State offered it as evidence. Mr. Henderson timely objected.

We agree with the State that E.J. could authenticate exhibit P1 as a report she received and gave to police. *See* ER 901(a), (b)(1) (authentication is satisfied by the testimony of a witness with knowledge that a matter is what it is claimed to be). But the State wanted to offer the exhibit for the truth of the result it reported, and the prosecutor argued that as a business record it qualified for an exception from the hearsay rule.

The Uniform Business Records as Evidence Act, chapter 5.45 RCW, "makes evidence that would otherwise be hearsay competent testimony." *State v. Ziegler*, 114 Wn.2d 533, 537, 789 P.2d 79 (1990). For the evidence to be admitted, RCW 5.45.020 requires that a "custodian or other qualified witness testif[y] to [the record's] identity and

the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event." The State now agrees that absent testimony from the record's custodian or another qualified witness, the report was hearsay and that objection, at least, should have been sustained. It argues that the error was harmless, however.

"The improper admission of evidence is reversible error only if it results in prejudice." *State v. Hatch*, 165 Wn. App. 212, 219, 267 P.3d 473 (2011). An erroneous evidentiary ruling "is not prejudicial unless, within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred." *State v. Tharp*, 96 Wn.2d 591, 599, 637 P.2d 961 (1981).

Mr. Henderson argues that admission of exhibit P1 was prejudicial because had a record custodian or other qualified witness been called and cross-examined, it might turn out that the test was ordered for a reason having nothing to do with a concern on E.J.'s part that she was pregnant. Laying a business record foundation for admitting the report would not have required a witness knowledgeable about the reason the test was ordered, however. *See* RCW 5.45.020. Mr. Henderson offers no authority otherwise, and when a party does not provide a citation to support an asserted proposition, we may assume that counsel, after diligent search, has found no supporting authority. *State v. Arredondo*, 188 Wn.2d 244, 262, 394 P.3d 348 (2017); *see also* RAP 10.3(a)(6) (arguments made must include supporting "citations to legal authority").

21

It is also pure speculation that if a custodian or other qualified witness called by the State *did* have first-hand knowledge about why the test was ordered, it would have been something other than a concern by E.J. that she was pregnant.

E.J., her mother, and the assistant director of E.J.'s school's drama department all testified that following the alleged rape, E.J. became concerned about being pregnant and had a blood test performed. E.J. testified without objection that the result was negative. Admission of exhibit P1 was cumulative and harmless.

IV.    THE TRIAL COURT DID NOT ERR BY REFUSING TO GIVE MR. HENDERSON'S PROPOSED INSTRUCTION ON FORCIBLE COMPULSION

Finally, Mr. Henderson contends the trial court erred when it refused to give his proposed jury instruction that "[f]orcible compulsion requires more than the force normally used to achieve sexual intercourse or sexual contact." CP at 27.

"It is not error to refuse to give a cumulative instruction or one collateral to or repetitious of instructions already given." *State v. Benn*, 120 Wn.2d 631, 655, 845 P.2d 289 (1993). We review a trial court's refusal to give a requested jury instruction de novo where the refusal is based on a ruling of law, and for abuse of discretion where the refusal is based on factual reasons. *State v. White*, 137 Wn. App. 227, 230, 152 P.3d 364 (2007).

The statement from *McKnight* and *Ritola* that Mr. Henderson proposed to offer as a further instruction was viewed on the facts of those cases as a corollary of the statutory definition of "forcible compulsion." The statutory definition was given to the jury in this

22

case as instruction 7, thereby enabling Mr. Henderson to offer argument that forcible compulsion should require more than the force normally used to achieve sexual intercourse. He did; he argued, "[L]ook at Instruction No. 7, it's simply not enough to prove that there was an act of sexual intercourse." RP at 313. The trial court did not abuse its discretion when it declined to give an instruction that was collateral to the statutory definition instruction.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

I CONCUR:

_____
Fearing, J.

23

No. 36305-8-III

LAWRENCE-BERREY, J. (dissenting) — Cougar Henderson had sexual intercourse with E.J. after she repeatedly said no. Henderson committed a serious crime, and he should be punished for the crime he committed. The question though, is what crime did he commit? Did he commit second degree rape or did he commit third degree rape?

Second degree rape can be committed in one of six ways defined by the legislature. RCW 9A.44.050(1)(a)-(f). Here, the State charged Henderson with second degree rape by forcible compulsion. RCW 9A.44.050(1)(a). "Forcible compulsion" means

> [1] physical force which overcomes resistance, or [2] a threat, express or implied, that places a person in fear of death or physical injury to herself or himself or another person, or in fear that she or he or another person will be kidnapped.

RCW 9A.44.010(6).

In contrast, third degree rape occurs when a person does not consent to sexual intercourse, and "such lack of consent was clearly expressed by the victim's words or conduct." Former RCW 9A.44.060(1)(a) (2013).

The State sought to prove Henderson used physical force that overcame E.J.'s

resistance. In response to whether she resisted, E.J. testified:

Eventually I had to after he ended up penetrating me multiple times with
the head of his penis[.] I had to put my elbow up in front of me and then
push him back into the . . . driver's side seat.

Report of Proceedings (RP) at 130-31. Henderson did not use physical force to overcome

E.J.'s resistance; once E.J. resisted by pushing Henderson with her elbow, the sexual

assault ended. The absence of force often is what distinguishes third degree rape from

second degree rape.

The law is well settled regarding what "forcible compulsion" means:

Forcible compulsion means that the force exerted was directed at
overcoming the victim's resistance and was more than that normally
required to achieve penetration. *State v. Wright*, 152 Wn. App. 64, 71, 214
P.3d 968 (2009); *State v. McKnight*, 54 Wn. App. 521, 774 P.2d 532
(1989). Under some circumstances, the resistance by the victim required to
show forcible compulsion need not be physical resistance.

11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL

45.03, Forcible Compulsion—Definition, cmt. at 918 (4th ed. 2016).

The second phrase of RCW 9A.44.010(6) permits a finding of forcible compulsion

even though a person does not physically resist during the sexual assault. According to

that phrase, physical resistance is not required if the person is "place[d] in fear of death or

physical injury to herself or himself or another person, or in fear that she or he or another

person will be kidnapped." By allowing these exceptions, the legislature sought to

2

maintain harsh punishments for those who used expressed or implied threats to deter others from physically resisting.

The majority relies on *McKnight*, 54 Wn. App. 521, to reach its conclusion that the State presented sufficient evidence of forcible compulsion. There, 14-year-old C. encountered 17-year-old McKnight near her home. *Id.* at 522. C. vaguely knew McKnight, but allowed him into her apartment when he asked to come inside. The two sat on a mattress in the living room and began to kiss. C. told McKnight to stop kissing her, but instead he slowly pushed her onto the couch and started pulling on her clothes. C. told him to stop, but he continued. McKnight disrobed C., undid his pants, and laid on top of her, which made her feel "'scared.'" *Id.* at 523. He then "'got inside'" her. *Id.* C. told him it hurt, but he still did not stop. *Id.*

The *McKnight* majority upheld the jury's verdict on the basis that reasonable minds could infer that McKnight used force greater than that inherent in the act of intercourse. *Id.* at 528. But the majority offered a better reason for its holding in a footnote response to the dissent. In that footnote, the majority explained C. was alone in her apartment with a stronger person, and the legislature did not intend to require persons such as C. to struggle. *Id.* at 528 n.2. This basis for affirming the jury verdict is consistent with the second phrase of RCW 9A.44.010(6), which defines forcible compulsion as including implied threats that place a person in fear of physical injury.

3

C. barely knew McKnight and testified she was scared as McKnight continued despite her protests.

The *McKnight* dissent observed, "In finding the victim's acts in this case amount to the statutorily required presence of 'resistance', the majority blurs, if not erases, the distinction between the two legislatively defined degrees of the crime." *Id.* at 532 (Forrest, J., dissenting). *McKnight*'s stated reason for upholding the jury's verdict does blur the distinction between second degree rape and third degree rape. C. did not physically resist. But the majority's explanation in its footnote is consistent with the second phrase of RCW 9A.44.010(6). C. was scared by McKnight, and a jury could reasonably infer she feared physical injury.

That is not the case here. Henderson and E.J. were in a dating relationship and decided to meet one evening. E.J. got into Henderson's small car, and Henderson drove some distance and then parked on the shoulder of a country road. After kissing and sexually touching for a while, E.J. noticed Henderson unzip his pants as if he wanted to have sex with her. As he positioned himself above her, she repeatedly said no. He penetrated her multiple times. After several seconds, E.J. used her elbow to push him away. Henderson did not use physical force to overcome E.J.'s successful effort of pushing him away.

There was no forcible compulsion as defined by RCW 9A.44.010(6). First, Henderson did not use any force beyond that inherent in sexual intercourse. Second,

4

Henderson did not use physical force to overcome E.J.'s resistance. When she pushed him away, the sexual assault ended. Third, there is no evidence E.J. feared she would be physically injured by resisting. In fact, E.J. did physically resist by pushing Henderson away. For these reasons, Henderson did not commit second degree rape by forcible compulsion. He committed third degree rape.

Second degree rape is a class A felony. RCW 9A.44.050(2). The standard range sentence for a person with an offender score of 1 is *86 to 114 months*. RCW 9.94A.510, .515. The trial court sentenced Henderson to 114 months. In contrast, third degree rape is a class C felony. RCW 9A.44.060(2). The standard range sentence for a person with an offender score of 1 is *12 to 14 months*. RCW 9.94A.510, .515. The significant difference in punishment between second degree rape and third degree rape requires a clear distinction between these two crimes.

The 2019 legislature redefined third degree rape as sexual intercourse where the person does not freely agree to it, as shown by the person's words or conduct. *See* RCW 9A.44.010(7), .060. The 2019 legislature did not redefine forcible compulsion. Because of this, the majority's construction of forcible compulsion has continuing consequences in this state.

Today, the majority holds that forcible compulsion includes having nonconsensual intercourse with a person who is "essentially trapped." Majority at 17. First, E.J. was not "essentially trapped." Henderson did not have his weight on E.J., and E.J. could and did

5

use her elbow to push him away. Second, nonconsensual sexual intercourse mostly occurs with a smaller person surrounded by and under a larger person. The smaller person would be as "essentially trapped" as E.J. The majority's rule thus transforms most third degree rapes into second degree rapes. Third, there is no statutory textual support for an "essentially trapped" rule.

The majority's holding today ignores clear statutory language and blurs second degree rape with third degree rape. There is a significant distinction between the two offenses, as shown by the legislature's decision to punish them so differently. Because the majority ignores this distinction, I dissent.

_Lawrence-Berrey, J._
Lawrence-Berrey, J.

6